THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA, :
:
        Plaintiff, :
:     CIVIL ACTION
   v. :
:     NO.
$425,055.42 IN FUNDS SEIZED FROM :
UNITED CENTRAL BANK ACCOUNT :
XXXX4605; $13,482.41 IN FUNDS :
SEIZED FROM BANK OF AMERICA :
ACCOUNT XXXXXXXX4994; $41,465.00 :
IN UNITED STATES CURRENCY; AND :
$3,047.00 IN UNITED STATES :
CURRENCY, :
:
        Defendants. :

## COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, Plaintiff in the above-styled civil action, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 21 U.S.C. § 881(a)(6), and files this Complaint for Forfeiture, showing the Court as follows:

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355 and 1391.

3. On or about June 5, 2013, agents of the United States Drug Enforcement Administration ("DEA") seized $3,047.00 in United States currency ("the Defendant $3,047") at 11

1

Dunwoody Park, Suite 120, Atlanta, Georgia, and $41,465.00 in United States currency ("the Defendant $41,465") at 1950 Willow Trail Parkway, Apt. 113, Norcross, Georgia, both places within the jurisdiction and venue of this Court.

4.  On June 5, 2013, DEA agents seized $425,055.42 in funds from United Central Bank account XXXX4605 held in the name of Nisar A. Piracha ("the Defendant $425,055.42").

5.  Also on June 5, 2013, DEA agents seized $13,482.41 in funds from Bank of America account XXXXXXXX4994 held in the name of Nisar A. Piracha ("the Defendant $13,482.41").

6.  The Defendant $425,055.42, the Defendant $13,482.41, the Defendant $41,465, and the Defendant $3,047 are presently within the jurisdiction of this Court and are being held in a government account maintained by the United States Marshals Service.

7.  Since approximately September 2012, law enforcement officers, including DEA Task Force Officer Jonathon Ware ("TFO Ware"), have been investigating a pain clinic known as Nisar A. Piracha MD, FACS, which is located at 11 Dunwoody Park, Suite 120, Atlanta, Georgia ("the Clinic")

for operating as a "pill mill," an ostensible pain clinic that illegally distributes controlled substances, including, but not limited to Oxycodone, Methadone, Xanax, and Percocet without a legitimate medical purpose.

8.  Pursuant to 21 U.S.C. § 841(a), except as authorized, it is unlawful for any person to knowingly or intentionally distribute or dispense a controlled substance.

9.  Oxycodone, a painkiller, is a Schedule II controlled substance.  Methadone, a pain-killer, is a Schedule II controlled substance.  Xanax, an anti-depressant, is a Schedule IV controlled substance.  Percocet, a pain-killer, is a Schedule II controlled substance.  Soma, a muscle-relaxer, is a Schedule IV controlled substance.

10.  Pursuant to 21 C.F.R. 1306.04(a), a physician can only issue a controlled substance prescription for a legitimate medical purpose.

11.  Business records show that Nisar A. Piracha ("Piracha") is the sole owner of and the sole physician at the Clinic.

12.  The investigation began after a source of information, an employee at the Clinic, informed law enforcement officers that patients paid $700 to receive prescriptions at the

3

Clinic without having to see the physician for a medical exam.

13. Undercover agents ("UC agents") and informants discovered that the Clinic operates as a cash-only business.

14. The investigation revealed that the Clinic does not accept payment in any other form such as Medicaid or Medicare.

15. During surveillance, UC agents have observed customers driving to the Clinic in vehicles with license plates from various states including Tennessee, Alabama, Mississippi, and South Carolina.

16. During the course of the investigation, UC agents made numerous visits to the Clinic using a confidential source of information ("CS") who acted as a "sponsor" for four UC agents.

17. Typically, the "sponsor" pays for all expenses associated with his "patients" seeing the doctor and getting the prescriptions filled.

18. In return, the "sponsor" receives a majority of the pills for diversion and/or distribution purposes while the "patient" receives a smaller share of those pills, usually to satisfy his or her addiction.

4

19. Throughout this investigation, the CS "sponsor" paid $250 for each person the CS sponsored at the Clinic. For example, when the CS and four UCs visited the Clinic at the same time, the CS paid the Clinic $1,250 in cash in exchange for receiving the majority of the pills for diversion and/or distribution.

20. During the undercover visits to the Clinic, employee Jennifer Washington accepted bribes from the CS to falsify urine screens in order to ensure that the screened specimen tested positive for the prescribed controlled substance.

21. A false urine scan allows the "sponsor" and their "patients" to give the impression that they are taking the prescribed medication, when in fact, the prescribed pills have been diverted.

22. During other undercover visits, Piracha prescribed medications to UC agents based solely on their requests rather than a legitimate medical purpose.

23. On one occasion, Piracha changed Task Force Officer Chris Crutchfield's ("TFO Crutchfield") prescriptions from Oxycodone 30mg to Dilaudid 4mg based solely on TFO Crutchfield's request.

5

24. On November 27, 2012, during an undercover visit, Clinic employee Jennifer Neace accepted a $100 bribe from the CS to overlook the fact that Neace had discovered UC agent Clark Vickery's prescription profile to be fraudulent.

25. On November 27, 2012, Special Agent Scott Nesbit ("SA Nesbit") had his initial undercover visit with Piracha at the Clinic.

26. The CS paid the Clinic for this undercover visit in his role as "sponsor".

27. SA Nesbit entered the Clinic with the CS and another UC agent, and at that time SA Nesbit did not have a prescription profile or an MRI with him.

28. The CS sponsor bribed employee Jennifer Washington to alter SA Nesbit's urine screen so that it appeared SA Nesbit had been taking opiates.

29. After obtaining an MRI, SA Nesbit met with Piracha.

30. SA Nesbit told Piracha that he had injured himself two years earlier by stepping in a hole.

31. SA Nesbit also told Piracha that he had never taken opiates.

32. Piracha never questioned SA Nesbit about how he could have tested positive for opiates during the urine screen

6

after SA Nesbit had just stated that he had never taken such medications.

33. Despite this disparity, Piracha wrote SA Nesbit prescriptions for 90 tablets of Oxycodone 30mg, 60 tablets of Methadone 10mg, and 30 tablets of Xanax 2mg.

34. On December 17, 2012, the CS obtained a set of prescriptions in the undercover name of TFO Crutchfield.

35. Later that same day, TFO Crutchfield obtained an identical set of prescriptions in his undercover name, despite the fact that the CS had already filled those prescriptions.

36. The CS called the Clinic and spoke with Clinic employee Jennifer Washington explaining that the CS had a second copy of the prescriptions issued to TFO Crutchfield.

37. Washington advised that the CS or TFO Crutchfield could fill the 2nd set of prescriptions as long as the CS used a pharmacy that would not call the Clinic's office to verify the prescriptions.

38. Washington instructed the CS to use a separate pharmacy in order to not attract any attention to the Clinic.

39. On March 11, 2013, during an undercover visit, Task Force Officer Aldrich ("TFO Aldrich") told Piracha that she had

used a Fentanyl patch to increase her sexual prowess and activity.

40. TFO Aldrich wanted to know if Piracha would give her a prescription for Fentanyl patches.

41. Piracha said that Fentanyl patches are only for people who are in an "end of life situation" and for those who cannot swallow.

42. Piracha also stated that Fentanyl is an opioid and that "maybe 50, 60 years ago" people used opium to help them have "hours and hours of long sex."

43. Piracha further stated that "this is something [he] can understand."

44. Piracha then asked TFO Aldrich if the Fentanyl patch is something that she needs and if she is that sexually advanced, and TFO Aldrich responded yes to both questions.

45. Piracha asked TFO Aldrich if she is into "one of those extreme things," and TFO Aldrich responded that she and TFO Crutchfield do some extreme things.

46. Piracha then asked TFO Aldrich if she hangs herself up with chains or anything, and TFO Aldrich replied that she does not.

47.  Piracha then told TFO Aldrich that they make "lotions" for men so that they do not "feel [pain]," but he did not know if there is a similar product for women.

48.  Piracha told TFO Aldrich that "unfortunately," an increase in sexual prowess is a "bad reason" for using a Fentanyl patch.

49.  Piracha then asked TFO Aldrich if she is into S&M, and TFO Aldrich replied that she is somewhat into it, such as being tied up.

50.  Piracha asked TFO Aldrich if she and TFO Crutchfield use handcuffs and/or similar items, and TFO Aldrich said yes.

51.  Piracha then stood very close to TFO Aldrich and, in a whisper, asked her if she does "anal."   TFO Aldrich responded that she does not.

52.  Piracha then whispered to TFO Aldrich that he likes anal.

53.  On April 8, 2013, TFO Aldrich met with Piracha for a follow up appointment.

54.  During the course of the appointment, TFO Aldrich again discussed getting a prescription for a Fentanyl patch from Piracha.

55.  Piracha stated that he did not want to prescribe the patch to TFO Aldrich because it was meant for a "very

advanced state" and because he did not want Fentanyl on TFO Aldrich's prescription record.

56. Piracha asked TFO Aldrich about her use of Fentanyl patches in the past.

57. TFO Aldrich stated that she had purchased one from a friend, cut the patch into quarters, and used them to enhance her sexual experiences.

58. Piracha asked TFO Aldrich if the patch affected her menstrual cycle or if she experienced withdrawals from her use of the patch.

59. TFO Aldrich told Piracha that the patch did not affect her menstrual cycle and since she rarely used the patches, she did not experience withdrawals.

60. Piracha again explained that a Fentanyl prescription would stay on her computerized record and that Fentanyl should only be used in special situations.

61. Piracha then asked if the patches gave TFO Aldrich a "euphoric" or "high" feeling, and TFO Aldrich replied yes.

62. Piracha also asked if using the Fentanyl patches made her "cum early" or if it affected her orgasms, and TFO

Aldrich stated that the Fentanyl made her orgasms stronger.

63. Piracha then asked TFO Aldrich if the patches made her "spurt out too," and TFO Aldrich stated the patches had, on occasion, made this occur.

64. Piracha then stated he "has to find out how that happens" and told TFO Aldrich that "maybe one day he can make a special event with her."

65. Piracha whispered for TFO Aldrich not to tell anyone, and he asked for her phone number. TFO Aldrich wrote down her government-issued telephone number for Piracha.

66. Later that same day, Piracha began sending text messages to TFO Aldrich.

67. On April 16, 2013, TFO Aldrich met Piracha for lunch at the Taco Mac restaurant located in Dunwoody.

68. During the course of the lunch, Piracha suggested that TFO Aldrich provide sexual favors in exchange for a prescription for Fentanyl patches.

69. Piracha further stated that the only way he could figure it to work was for him to write the prescription for Fentanyl in someone else's name.

70. TFO Aldrich told Piracha that she had several friends with fake identification that could be used.

71. Piracha also offered to "help" TFO Aldrich financially in return for sexual favors.

72. Piracha again asked TFO Aldrich to keep their arrangement a secret, and he suggested that they could start out doing only what TFO Aldrich was comfortable with doing.

73. Piracha also suggested he and TFO Aldrich meet for drinks before such a rendezvous.

74. The investigation has revealed that in March 2009, Piracha was reprimanded by the Medical Board for the State of New York for inappropriate behavior and physical contact with female patients.

75. According to the New York Medical Board's reprimand orders, Piracha made comments regarding a female patient's underwear, questioned her in regards to the way she kissed her boyfriend, and made comments regarding her "beauty."

76. In regards to a separate patient, Piracha made repeated calls to a patient in an interest to date her mother.

77. The hospital that employed Piracha at the time, Olean General Hospital in New York, mandated that Piracha only

examine female patients with a female chaperone present, which Piracha ignored on one documented occasion.

78. Piracha was also reprimanded for lying to an officer who stopped Piracha for a traffic violation.

79. Piracha told the officer that he had been called into the hospital when he had not in fact been so called, and Piracha had asked a nurse at the hospital to be complicit in that lie.

80. During the course of the investigation, all undercover patients received prescriptions for medications outside the usual scope of medical practice in the same strength and for the same pill counts during each visit.

81. The following chart details a variety of prescriptions received by the CS and UC agents without legitimate medical purpose and with minimal or no physical examination by the physician at Piracha's clinic.

Nisar A. Piracha Prescriptions

| Undercover Patient | Pill Count | Medication | Strength | Date Received |
|---|---|---|---|---|
| | 90 | Oxycodone | 30mg | 11/19/2012 |
| | 60 | Methadone | 10mg | 11/19/2012 |
| | 30 | Xanax | 2mg | 11/19/2012 |
| | 90 | Oxycodone | 30mg | 12/17/2012 |
| | 60 | Methadone | 10mg | 12/17/2012 |
| | 30 | Xanax | 2mg | 12/17/2012 |
| | 120 | Dilaudid | 4mg | 1/14/2013 |
| | 60 | Methadone | 10mg | 1/14/2013 |
| | 30 | Xanax | 2mg | 1/14/2013 |
| | 120 | Dilaudid | 4mg | 2/11/2013 |
| | 60 | Methadone | 10mg | 2/11/2013 |
| | 30 | Xanax | 2mg | 2/11/2013 |
| | 120 | Dilaudid | 4mg | 3/11/2013 |
| | 60 | Methadone | 10mg | 3/11/2013 |
| | 30 | Xanax | 2mg | 3/11/2013 |
| | 10 | Viagra | 100mg | 3/11/2013 |
| | 120 | Dilaudid | 4mg | 4/8/2013 |
| | 90 | Methadone | 10mg | 4/8/2013 |
| | 30 | Xanax | 2mg | 4/8/2013 |
| | 10 | Viagra | 100mg | 4/8/2013 |
| | 120 | Percocet | 10-325mg | 12/17/2012 |
| | 60 | Methadone | 10mg | 12/17/2012 |
| | 90 | Oxycodone | 30mg | 1/14/2013 |
| | 60 | Methadone | 10mg | 1/14/2013 |
| | 30 | Xanax | 2mg | 1/14/2013 |
| | 90 | Oxycodone | 30mg | 2/11/2013 |
| | 60 | Methadone | 10mg | 2/11/2013 |
| | 30 | Xanax | 2mg | 2/11/2013 |
| | 90 | Oxycodone | 30mg | 3/11/2013 |
| | 60 | Methadone | 10mg | 3/11/2013 |
| | 30 | Xanax | 2mg | 3/11/2013 |
| | 90 | Oxycodone | 30mg | 4/8/2013 |
| | 60 | Methadone | 10mg | 4/8/2013 |
| | 30 | Xanax | 2mg | 4/8/2013 |
| | 90 | Oxycodone | 30mg | 11/27/2012 |
| | 60 | Methadone | 10mg | 11/27/2012 |
| | 30 | Xanax | 2mg | 11/27/2012 |
| | 120 | Percocet | 10-325mg | 1/9/2013 |
| | 60 | Methadone | 10mg | 1/9/2013 |
| | 30 | Xanax | 2mg | 1/9/2013 |
| | 120 | Oxycodone | 30mg | 2/11/2013 |
| | 60 | Methadone | 10mg | 2/11/2013 |
| | 30 | Xanax | 2mg | 2/11/2013 |
| | 120 | Oxycodone | 30mg | 3/11/2013 |
| | 60 | Methadone | 10mg | 3/11/2013 |
| | 45 | Xanax | 2mg | 3/11/2013 |
| | 120 | Oxycodone | 30mg | 4/8/2013 |
| | 90 | Methadone | 10mg | 4/8/2013 |
| | 45 | Xanax | 2mg | 4/8/2013 |
| | 90 | Oxycodone | 30mg | 11/27/2012 |
| | 60 | Methadone | 10mg | 11/27/2012 |
| | 30 | Xanax | 2mg | 11/27/2012 |
| | 90 | Oxycodone | 30mg | 1/14/2013 |
| | 60 | Methadone | 10mg | 1/14/2013 |
| | 30 | Xanax | 2mg | 1/14/2013 |
| | 90 | Oxycodone | 30mg | 2/11/2013 |
| | 60 | Methadone | 10mg | 2/11/2013 |
| | 30 | Xanax | 2mg | 2/11/2013 |
| | 90 | Oxycodone | 30mg | 3/11/2013 |
| | 60 | Methadone | 10mg | 3/11/2013 |
| | 30 | Xanax | 2mg | 3/11/2013 |
| | 120 | Oxycodone | 30mg | 4/8/2013 |
| | 90 | Methadone | 10mg | 4/8/2013 |
| | 30 | Xanax | 2mg | 4/8/2013 |

**TOTAL PILL COUNTS**

| Oxycodone | Methadone | Xanax | Dilaudid | Percocet |
|---|---|---|---|---|
| **1950** | **1500** | **720** | **480** | **240** |

CS Received 2nd set of these prescriptions, Jennifer Washington aware
CS Received 2nd set of these prescriptions, Jennifer Washington aware
CS Received 2nd set of these prescriptions, Jennifer Washington aware

| Oxy Pills | Dilaudid | Methadone | Xanax |
|---|---|---|---|
| 180 | 480 | 330 | 180 |

received even though UC stated did not have medical need

received even though UC stated did not have medical need

| Oxy Pills | Percocet | Methadone | Xanax |
|---|---|---|---|
| 360 | 120 | 240 | 120 |

| Oxy Pills | Percocet | Methadone | Xanax |
|---|---|---|---|
| 450 | 120 | 270 | 180 |

| Oxy pills | Methdone | Xanax |
|---|---|---|
| 480 | 330 | 150 |

14

82. The investigation revealed that Piracha transported large sums of United States currency in a large blue bag from the Clinic to his residence at an extended stay motel, InTown Suites, located at 1950 Willow Trail Parkway, Suite 113, Norcross, Georgia in order to subvert tax reporting and to avoid law enforcement detection.

83. On March 18, 2013, UC agents observed Piracha exiting the Clinic at 4:00 p.m. while carrying a large blue bag.

84. UC agents observed Piracha place the blue bag in the rear of his 2001 black Lexus LS430 and depart from the area.

85. UC agents maintained surveillance Piracha's Lexus until 6:45 p.m. when Piracha arrived at the InTown Suites.

86. Piracha exited the Lexus and entered suite #113 carrying the large blue bag.

87. UC agents observed Piracha utilizing the same blue bag in a similar manner on March 29, April 8, and May 21, 2013.

88. On March 29, 2013, TFO Crutchfield observed Piracha exit his room at the InTown Suites carrying the large blue bag.

89. TFO Crutchfield observed Piracha place the blue bag into his 2001 black Lexus LS430 and travel to the Clinic.

15

90. Once at the Clinic, Piracha exited the Lexus and carried the blue bag into the Clinic.

91. A few minutes later, Piracha exited the Clinic, traveled to the Bank of America branch located at 4545 Chamblee Dunwoody Road, and conducted a transaction inside the bank.

92. Bank of America records show that Piracha deposited $5,000 in cash into account number XXXXXXXX4994 held in the name of Nisar A. Piracha ("BOA 4994")

93. Bank records further show that Piracha pays the Clinic's employees using checks drawn on Bank of BOA 4994.

94. Based on the bank records, TFO Ware believes that BOA 4994 is in fact the operating account for the Clinic.

95. From the investigation, TFO Ware learned that Piracha also owns and controls United Central Bank account number XXXX4605 held in the name of Nisar A. Piracha ("United 4605").

96. Bank records show that Piracha opened United 4605 on May 7, 2012 at the Jimmy Carter banking center located at 5675 Jimmy Carter Boulevard, Suite 103, Norcross, Georgia.

97.  The bank records further show that Piracha is the sole signatory on United 4605.

98.  A review of the bank records shows that from May 7, 2012, (approximately one month after the Clinic opened) through December 3, 2012, Piracha deposited a total of $299,888 in cash into United 4605 as follows:

a.  $58,100 on May 7, 2012;

b.  $29,960 on May 16, 2012;

c.  $7,500 on May 26, 2012;

d.  $8,500 on May 30, 2012;

e.  $19,900 on June 9, 2012;

f.  $13,200 on June 22, 2012;

g.  $14,958 on June 27, 2012;

h.  $17,230 on July 6, 2012;

i.  $43,600 on September 28, 2012;

j.  $21,050 on October 19, 2012;

k.  $31,290 on November 3, 2012;

l.  $11,000 on November 21, 2012; and

m.  $23,600 on December 3, 2012.

99.  The bank records further show that Piracha ceased to make large cash deposits into United 4605 in December 2012.

100. Instead of large cash deposits, bank records show that Piracha began to make large check deposits into United 4605, including various checks drawn on two accounts held in the name of JB's International, 3645 Oakcliff Road, Suite A, Doraville, Georgia, 30340.

101. Bank records show that Piracha deposited checks drawn on JB's International's accounts as follows:

a.   a $50,000 check dated November 29, 2012 that Piracha deposited on December 1, 2012;

b.   a $42,160 check dated December 7, 2012 that Piracha deposited on December 12, 2012;

c.   a $56,640 check dated February 8, 2013 that Piracha deposited on February 9, 2013;

d.   a $51,072 check dated March 1, 2013 that Piracha deposited on March 1, 2013;

e.   a $42,000 check dated April 13, 2013 that Piracha deposited on April 13, 2013; and

f.   a $60,000 check dated April 10, 2013 that Piracha deposited on April 13, 2013.

102. The bank records also show that there were similar large cash deposits into the two JB's International accounts at

approximately the same time that the above-listed checks were written to Piracha, although not in exact amounts.

103. Records show that there were nearly daily cash deposits over $10,000 into the JB's International accounts.

104. The bank records further show that the above-referenced $60,000 and $42,000 checks that Piracha deposited into United 4605 on April 13, 2013 had memo lines stating that the checks from JB's International were for "loan repayment."

105. An open source search of JB's International shows it to be a metal scrapping/recycling business.

106. Records on file with the Georgia Secretary of State's Office reveal that JB's International's registered agent is Jaime Restrepo-Agudelo.

107. UC agents conducted surveillance at JB's International's alleged business address of 3645 Oakcliff Road in Doraville, and they found nothing to indicate that an actual business is located there.

108. On May 23, 2013, TFO Ware found a new address for JB's International, 7655 E. Ponce De Leon Circle, Atlanta, Georgia, and TFO Ware conducted surveillance at that location.

109. TFO Ware observed a large warehouse-type building surrounded by a chain link fence at that address.

110. Although TFO Ware observed a JB's International sign, TFO Ware did not see anything to indicate that the business was in fact operating.

111. Bank record for JB's International show a continuous high volume of cash deposits, withdrawals, and wire transfers into and out of its various bank accounts.

112. Based on the investigation, DEA agents sought and executed search warrants, seizure warrants and arrest warrants on June 5, 2013.

113. On June 5, 2013 TFO Crutchfield executed Federal seizure warrants at the Bank of America and seized the Defendant $13,482.41.

114. On June 5, 2013 agents executed a Federal seizure warrant at United Central Bank located at 5675 Jimmy Carter Boulevard, Norcross, Georgia and seized the Defendant $425,055.42.

115. The manager at United Central Bank is Muhammad Farooqui ("Farooqui").

116. When agents presented the seizure warrant to Farooqui, the agents observed that Farooqui appeared to be nervous.

117. Farooqui also asked agents questions about the investigation that led to the seizure.

118. On that same day, TFO Crutchfield executed a Gwinnett County Superior Court search warrant at Piracha's suite at the InTown Suites.

119. During the search, agents seized the Defendant $41,465 from a red garment box that was hidden within a zippered bag.

120. The Defendant $41,465 was packaged in rubber bands and had various notes attached listing different dates and sums of money.

121. Agents seized the Defendant $41,465 as drug proceeds derived from the illegal distribution of controlled substances.

122. On June 5, 2013 DEA agents executed a Dekalb County Search Warrant at the Clinic.

123. Piracha, employees Demarcus Martin and Jennifer Washington, and patients were present during the search.

124. During the search, agents seized the Defendant $3,047 from a locked box in a desk drawer in the reception area.

125. The Defendant $3,047 was bundled with paper clips and had sticky notes depicting who had made the payments on it.

21

126. The agents seized the Defendant $3,047 as drug proceeds derived from the illegal distribution of controlled substances.

127. Agents arrested both Piracha and his medical assistant, Jennifer Washington and charged them with Distribution of Oxycodone.

128. TFO Ware and TFO William Manning read Piracha his Miranda rights, and Piracha agreed to speak to the agents without an attorney.

129. Piracha told the agents that he met Farooqui approximately one and a half years earlier.

130. Piracha stated that he and Farooqui are both from Karachi, Pakistan and that they became friends and played squash together.

131. Piracha told agents that he had a discussion with Farooqui regarding the large sums of cash generated from his clinic.

132. Piracha stated that he wanted to do something with the cash rather than storing it in his hotel room.

133. According to Piracha, he approached Farooqui about the money and asked about loaning the cash.

134. Agents asked Piracha whether Farooqui was known in the Pakistani ex-pat community for loaning cash to or being involved in Hawala.

135. The Hawala system is an alternative currency remittance system that exists and operates outside of traditional and legitimate financial channels. Hawala operates as a "black market" method of currency exchange and transfer of funds from the United States to primarily the Middle East, Africa, and Asia.

136. Piracha stated that Farooqui was not involved in Hawala.

137. Piracha stated that he delivered cash on four occasions to Farooqui.

138. According to Piracha, he and Farooqui met on three occasions at restaurant parking lots on Jimmy Carter Boulevard and once at Farooqui's residence located in Lawrenceville, Georgia.

139. On each occasion, Piracha would deliver between $40,000 and $50,000 in cash to Farooqui.

140. Piracha stated that all of the cash he brought to Farooqui came from proceeds at the Clinic.

141. Piracha further stated that the cash was wrapped in rubber bands and packaged in $1,000 and $5,000 bundles.

142. Piracha stated that he never asked Farooqui where the cash was going.

143. Agents asked Piracha if he kept written records, or ledgers, of the cash payments.

144. Piracha stated that he did not, but that he knew in his head how much he gave Farooqui.

145. However, Piracha was unable to tell agents what those cash amounts were.

146. Piracha stated that Farooqui would later deposit a check written on an account from JB's International, LLC into Piracha's United Central Bank account with the notation "repayment of loan."

147. During the search of Piracha's office, agents located an envelope on Piracha's desk that contained records of the deposits.

148. According to the records, the amount of each deposit varied but each was over $40,000.

149. Piracha admitted to seeing bank records showing that the deposits made by Farooqui were from JB's International, LLC.

150. However, Piracha did not know anything about JB's International's business nor had he gone to check the scrap yard's location.

151. Agents again asked Piracha what Farooqui did with the cash.

152. Piracha stated that he thought Farooqui loaned the money to JB's International, LLC but was unsure if that was true.

153. Agents asked Piracha whether it was possible that Farooqui loaned the money to terrorist organizations.

154. Piracha stated that he did not know what Farooqui did with the money.

155. While Piracha described his transactions with Farooqui, he never mentioned how much money he was making on each transaction.

156. TFO Manning asked Piracha how much money he made on each delivery of cash, and Piracha stated that he did not understand the question.

157. TFO Manning then explained that the nature of loaning money as an investment is to make a profit, unless Piracha just liked giving people his cash.

158. Piracha hesitated before responding that he made a little money, maybe 1% or 2%.

159. TFO Manning asked why Piracha did not put the cash in a certificate of deposit or money market account, where he could make the same interest.

160. Piracha responded that he could not make a 1% or 2% return at the bank.

161. The agents told Piracha that it appeared to them that he was attempting to deceive the agents.

162. The agents told Piracha that he was delivering cash to Farooqui, who would then launder the cash and deposit checks from JB's International into Piracha's United Central Bank account, notated as "repayment of a loan" in order to disguise the true source of the income, which is from the Clinic.

163. The agents also told Piracha that the amounts of the deposited checks would be consistent with a $50,000 cash payment, less a commission of around 10% to launder the money and disguise it as a loan rather than taxable income.

164. Piracha denied the agents' statements and told agents that he had recently written checks to the IRS on his

United Central Bank account and he was concerned that the checks may not have cleared before DEA agents seized the accounts.

165. TFO Manning recapped the interview with Piracha as follows:

    a.    Piracha had given Farooqui approximately $200,000 in cash and had received approximately $150,000 back, which he deposited into his United Central Bank account;

    b.    Piracha was owed approximately $50,000 from Farooqui;

    c.    All of the cash he gave Farooqui had been derived from cash payments from patients at the Clinic;

    d.    Piracha transported cash from the Clinic to his Gwinnett County hotel room at InTown Suites;

    e.    Piracha then delivered cash to Farooqui, who took the cash and did something with the cash that Piracha does not know about;

    f.    In return for the cash, Piracha received and deposited checks from JB's International, LLC into his United Central Bank account;

g. The checks Piracha received were written to Piracha and marked as "repayment of loan;"

h. Piracha never recorded the amount of cash given to Faroooqui; and

i. Piracha kept the amount of the cash in his head but could not tell agents what those amounts were.

166. Piracha agreed with TFO Manning's recap of the interview.

167. Pursuant to 18 U.S.C. § 981 (a) (1) (A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 1957 is subject to forfeiture to the United States.

168. Pursuant to 18 U.S.C. § 1956(a)(1)(A)(i), it is a crime for any person to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the intent to promote the carrying out of the specified unlawful activity.

169. Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a crime for any person to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the intent to conceal or disguise

the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

170. Pursuant to 18 U.S.C. § 1957, it is a crime to engage or attempt to engage in a monetary transaction involving criminally derived property having a value greater than $10,000, knowing that the property was derived from unlawful activity.

171. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity" is subject to forfeiture to the United States.

172. 18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" in relevant part as any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

173. 18 U.S.C. § 1961(1) includes, as part of the list of offenses, "dealing in a controlled substance or listed chemical."

174. The Defendant $3,047, the Defendant $41,465, the Defendant $425,055.42, and the Defendant $13,482.41 are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), because they are involved in or

are traceable to a money laundering transaction or an attempted money laundering transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

175. The Defendant $3,047, the Defendant $41,465, the Defendant $425,055.42, and the Defendant $13,482.41 are also subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), because they constitute or were derived from proceeds traceable to a specified unlawful activity, namely the illegal distribution of controlled substances.

176. The Defendant $3,047, the Defendant $41,465, the Defendant $425,055.42, and the Defendant $13,482.41 are also subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or were intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or that they were used or were intended to be used to facilitate the sale or exchange of a controlled substance.

WHEREFORE, the United States prays that:

1)   The Court forfeit the Defendant $3,047, the Defendant $41,465, the Defendant $425,055.42, and the Defendant $13,482.41 to the United States of America;

2)   The Court award Plaintiff the costs of this action; and

3)   The Court grant such other relief as the Court deems just and proper under the facts and circumstances of this case.

This _23rd_ day of September, 2013.

                              Respectfully submitted,

                              SALLY QUILLIAN YATES
                              UNITED STATES ATTORNEY

                              MICHAEL J. BROWN
                              ASSISTANT U.S. ATTORNEY
                              Georgia Bar No. 064437
                              600 U.S. Courthouse
                              75 Spring Street, S.W.
                              Atlanta, Georgia  30303
                              404-581-6131
                              Michael.J.Brown2@usdoj.gov

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,                    :
                                             :
              Plaintiff,                     :
                                             :        CIVIL ACTION
      v.                                     :
                                             :        NO.
$425,055.42 IN FUNDS SEIZED FROM :
UNITED CENTRAL BANK ACCOUNT                  :
XXXX4605; $13,482.41 IN FUNDS                :
SEIZED FROM BANK OF AMERICA                  :
ACCOUNT XXXXXXX4994; $41,465.00 :
IN UNITED STATES CURRENCY; AND   :
$3,047.00 IN UNITED STATES                   :
CURRENCY,                                    :
                                             :
              Defendants.                    :


## VERIFICATION OF COMPLAINT FOR FORFEITURE

I, Jonathon Ware, of the United States Drug Enforcement Administration, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 23rd day of September, 2013.

TASK FORCE OFFICER JONATHON WARE
DRUG ENFORCEMENT ADMINISTRATION